OPINION *Page 3 
{¶ 1} Plaintiffs-appellants, Jeanne and Michael Lehrman, appeal from a Jefferson County Common Pleas Court, Juvenile Division decision denying their motion for custody of their granddaughter and granting the child's custody to her mother, defendant-appellee, Jonette Irwin.
 {¶ 2} Jaden Todd was born to appellee and Jeremy Todd on December 3, 1998. Appellants are Jaden's paternal grandmother and step-grandfather.
 {¶ 3} Appellants filed a complaint for legal custody on January 3, 2005. They alleged that appellee was recently released from a detoxification program and, along with her boyfriend, was still using drugs. They further alleged that they were concerned for Jaden's safety. Along with the complaint, they filed a consent to custody signed by Jeremy. The trial court entered an emergency order of temporary custody to appellants.
 {¶ 4} A magistrate held a hearing on appellants' motion. He found that although appellee has a history of drug abuse and failed attempts at rehabilitation, she is not an unsuitable parent. He noted that children's services performed an investigation and, based on that investigation, would not have removed Jaden from appellee's care. The magistrate also found that, while in appellee's care, Jaden was attending school, her appearance was neat, and she was well-adjusted. Thus, the magistrate recommended that appellants' complaint be denied, that Jaden be returned to appellee's care, that the Jefferson County Department of Job and Family Services (JCDJFS) have protective supervision of Jaden for six months, and ordered appellee to continue counseling and submit to random drug screening.
 {¶ 5} Appellants filed objections to the magistrate's decision. Additionally, they filed motions asking the court to interview Jaden regarding where she wished to reside and asking that the court order appellee to release her medical records for review, in light of her history of drug abuse. The trial court held a hearing on appellants' objections and motions. It subsequently overruled the motions and objections. It denied appellants' complaint for custody, adopted the magistrate's recommendations, and ordered that Jaden be returned to appellee's care. *Page 4 
 {¶ 6} Appellants filed a timely notice of appeal on August 14, 2006.
 {¶ 7} Appellants raise four assignments of error, the first of which states:
 {¶ 8} "THE TRIAL COURT ERRED BY NOT APPOINTING A GUARDIAN AD LITEM FOR SAID CHILD AFTER A REQUEST THAT THE CHILD BE INTERVIEWED WAS MADE."
 {¶ 9} Appellee filed a request for the court to interview Jaden on June 30, 2005. Neither appellee nor appellants requested that the court appoint a guardian ad litem (GAL) for Jaden. Subsequently, after the magistrate issued his recommendations, appellants filed a motion asking the court to re-interview Jaden. Again, appellants made no request for the appointment of a GAL.
 {¶ 10} Juv.R. 4(B) provides in part:
 {¶ 11} "The court shall appoint a guardian ad litem to protect the interests of a child or incompetent adult in a juvenile court proceeding when:
 {¶ 12} "* * *
 {¶ 13} "(2) The interests of the child and the interests of the parent may conflict;
 {¶ 14} "* * *
 {¶ 15} "(4) The court believes that the parent of the child is not capable of representing the best interest of the child.
 {¶ 16} "* * *
 {¶ 17} "(8) Appointment is otherwise necessary to meet the requirements of a fair hearing."
 {¶ 18} Appellants argue that pursuant to the above quoted portion of Juv.R. 4(B), the court was required to appoint a GAL for Jaden. They contend that appellee's interests conflicted with Jaden's interests, and therefore, appellee could not represent Jaden's best interest.
 {¶ 19} The Twelfth District addressed a very similar situation inIn re McQuitty (May 5, 1986), 12th Dist. No. CA85-04-016.McQuitty involved a custody dispute between a mother and a grandmother. The grandmother sought temporary custody *Page 5 
of the child, alleging he was dependent or neglected. The trial court found that the mother was to have custody of her child.
 {¶ 20} On appeal, the grandmother argued, among other things, that the magistrate should have appointed a GAL for the child because his interests conflicted with those of his mother. She cited to Juv.R. 4(B)(2) for support. The court held that Juv.R. 4(B)'s language is mandatory and, therefore, the trial court should have appointed a GAL for the child. However, the court did not stop there. Instead, it explained:
 {¶ 21} "An examination of the transcript of proceedings in this case reveals that the same referee who heard the evidence on appellant's complaint conducted an at-length in camera interview of Donnie during the course of these proceedings sufficient to advise him of the youngster's mental and physical condition, his schooling and activities, his fears and reservations concerning the proceedings, and his wishes concerning their outcome. Based on this transcribed interview, while the failure to appoint a guardian ad litem was error, we find it was not prejudicial to appellant because the referee made himself aware of the child's feelings about the proceedings just as a guardian ad litem, if appointed, would have. Moreover, we agree with appellee and find from the record that appellant's objection to the failure to appoint a guardian ad litem was never brought to the referee's attention before a hearing was held but was saved until his adverse recommendation was filed.
 {¶ 22} "Because we believe the referee's in camera interview with Donnie sufficed to provide the referee with the same information as a guardian ad litem would have provided, we do not feel appointment of a guardian ad litem would have changed the outcome of this case. We have previously held in In Re Vickers Children (1983), 14 Ohio App.3d 201, that when a departure from the juvenile rules does not rise to the level of plain error, it need not be reversed. This is such a situation." Id.
 {¶ 23} The same reasoning applies here.
 {¶ 24} First, appellants never asked the magistrate or the trial court to appoint *Page 6 
a GAL for Jaden. They did not even bring this up in their objections to the magistrate's decision. A party's failure to bring an alleged error to the trial court's attention through an objection, waives the party's right to raise that alleged error on appeal. In re Z.C., 12th Dist. Nos. CA2005-06-065, CA2005-06-066, CA2005-06-081, CA2005-06-082,2006-Ohio-1787, at ¶ 18. Thus, we can only review appellants' argument for plain error.
 {¶ 25} Second, the magistrate conducted a thorough in camera interview with Jaden. The magistrate talked to Jaden and was able to ascertain her mental and physical state. He was also able to discuss with Jaden her opinions regarding appellants, appellee, and appellee's boyfriend. And the magistrate discussed other subjects with Jaden, such as school, friends, and her younger half-brother. Thus, by talking with Jaden, the magistrate gathered much of the same information that a GAL would have provided.
 {¶ 26} Therefore, while the magistrate may have erred in failing to appoint a GAL for Jaden, as in McQuitty, any error was harmless and does not rise to the level of plain error.
 {¶ 27} Appellants also contend that pursuant to R.C. 3109.04(B)(2)(a), the court was required to appoint a GAL for Jaden. That section reads:
 {¶ 28} "(2) If the court interviews any child pursuant to division (B)(1) of this section, all of the following apply:
 {¶ 29} "(a) The court, in its discretion, may and, upon the motion of either parent, shall appoint a guardian ad litem for the child." R.C.3109.04(B)(2)(a).
 {¶ 30} This section does not speak in mandatory terms. It explicitly states that the court, in its discretion, may appoint a GAL. It also states that upon the motion of either parent, the court shall appoint a GAL. However, nowhere does it state that the court shall appoint a GAL when neither party has requested that it do so. Thus, since in this case neither party requested that the court appoint a GAL, it was within the court's discretion whether or not to appoint one. Thus, appellant's argument that this section mandated that the court appoint a GAL must fail. *Page 7 
 {¶ 31} Accordingly, appellants' first assignment of error is without merit.
 {¶ 32} Appellants' second assignment of error states:
 {¶ 33} "THE TRIAL COURT ERRED BY FAILING TO INTERVIEW THE MINOR CHILD AFTER HAVING BEEN REQUESTED TO DO SO."
 {¶ 34} Here appellants argue that the trial court should have interviewed Jaden before ruling on their objections, as they requested. They argue that, pursuant to R.C. 3109.04(B)(1), the court was required to interview Jaden when they requested that it do so.
 {¶ 35} R.C. 3109.04(B)(1) provides:
 {¶ 36} "When making the allocation of the parental rights and responsibilities for the care of the children under this section in an original proceeding or in any proceeding for modification of a prior order of the court making the allocation, the court shall take into account that which would be in the best interest of the children. In determining the child's best interest for purposes of making its allocation of the parental rights and responsibilities for the care of the child and for purposes of resolving any issues related to the making of that allocation, the court, in its discretion, may and, upon the request of either party, shall interview in chambers any or all of the involved children regarding their wishes and concerns with respect to the allocation."
 {¶ 37} This section is applicable to custody matters arising in juvenile court. R.C. 2151.23(F)(1).
 {¶ 38} Appellants cite several cases for the proposition that R.C.3109.04(B)(1) is mandatory. See Dolub v. Chmielewski, 9th Dist. No. 22405, 2005-Ohio-4662; Scassa v. Scassa (July 7, 1998), 7th Dist. No. 688; Badgett v. Badgett, (1997), 120 Ohio App.3d 448, 698 N.E.2d 84. However, those cases involved situations where the child was never interviewed, although such a request was made by one of the parties. This case is distinguishable.
 {¶ 39} Here, appellee requested that the magistrate interview Jaden and the magistrate did just that. Pursuant to Juv.R. 40(C)(1)(b), in order to assist juvenile *Page 8 
courts of record, a magistrate has the authority to conduct the trial of any case that will not be tried to a jury. This authority would include the authority to interview a child. Thus, the magistrate had authority to interview Jaden in place of the court itself doing so. R.C.3109.04(B)(1) contains no requirement that the court re-interview a child every time a party files a motion for it to do so.
 {¶ 40} Furthermore, the transcript of the magistrate's interview with Jaden was filed in the trial court on July 18, 2005. The trial court did not rule on appellants' objections until July 18, 2006. Thus, the court had the transcript of the interview available to it along with the transcripts of all of the other testimony from the hearings. There is no indication that the trial court ignored all of the properly filed transcripts in ruling on appellants' objections and adopting the magistrate's decision.
 {¶ 41} Accordingly, appellants' second assignment of error is without merit.
 {¶ 42} Appellants' third assignment of error states:
 {¶ 43} "THE TRIAL COURT ERRED BY DETERMINING THE MOTHER TO BE A SUITABLE PERSON TO HAVE CUSTODY OF HER CHILD AS SUCH FINDING IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 44} Appellants argue that the trial court's finding that appellee is a suitable parent is against the weight of the evidence. They argue that the evidence clearly demonstrated that an award of custody to appellee would be detrimental to Jaden. They cite to evidence of appellee's drug use and her several attempts at detoxification programs.
 {¶ 45} The present case arose under R.C. 2151.23(A)(2), which gives the juvenile court exclusive original jurisdiction to determine the custody of any child not a ward of another court of the state.
 {¶ 46} "In a child custody case arising out of a parentage action between a natural parent of the child and a nonparent, a trial court must make a parental unsuitability determination on the record before awarding legal custody of the child to the nonparent." In reHockstok, 98 Ohio St.3d 238, 781 N.E.2d 971, 2002-Ohio-7208, at the syllabus. In other words the court must first determine by a *Page 9 
preponderance of the evidence that: (1) the parent abandoned the child; (2) the parent contractually relinquished custody of the child; (3) the parent has become totally incapable of supporting or caring for the child; or (4) an award of custody to the parent would be detrimental to the child. In re Perales (1977), 52 Ohio St.2d 89, 369 N.E.2d 1047, at the syllabus. Parents who are deemed suitable have a paramount right to custody of their minor children. Id. at 97.
 {¶ 47} Thus, we must determine whether the preponderance of the evidence demonstrated one of the four unsuitability factors listed above with regard to appellee. There is no question that the first three factors do not apply in this case. No evidence was presented that appellee abandoned Jaden, that she contractually relinquished custody, or that she is totally incapable of caring for Jaden. Consequently, this case turns on whether an award of custody to appellee would be detrimental to Jaden. The evidence revealed the following.
 {¶ 48} Appellants testified about appellee's drug use and why they asked for custody of Jaden. Appellant, Michael Lehrman, testified that appellee told him that she was using cocaine. (Tr. 13). He also stated that appellee told him that her boyfriend, Dino Suriano, gave her the drugs. (Tr. 13). And he testified that Jaden had expressed fear of Suriano. (Tr. 36). Appellant, Jeanne Lehrman, stated that while Jaden missed appellee and her little brother, she did not want to be around Suriano. (Tr. 51). Patricia Todd, Jaden's step-grandmother, also testified that Jaden was afraid of Suriano. (Tr. 73). Jeanne also testified that she filed the custody complaint because appellee's mother had called her and told her that the conditions at appellee's house were bad. (Tr. 49).
 {¶ 49} Appellants also testified about Jaden's demeanor. They stated that when Jaden first came to live with them, she was very withdrawn and was afraid to run or play. (Tr. 15-16, 51). Additionally, they stated that Jaden became angry easily. (Tr. 16, 51). Appellants took Jaden to see a psychologist and since then, Michael testified, her attitude had improved. (Tr. 17). Appellants testified that Jaden is now happy and runs and plays. (Tr. 17, 51). Additionally, Patricia Todd testified *Page 10 
that since Jaden has been in appellants' care she has become a much happier child and is no longer withdrawn as she had been in the past. (Tr. 69).
 {¶ 50} Jeremy Todd, Jaden's father, testified about appellee's drug problem. He stated that when the two of them were together, four years ago, they used cocaine, marijuana, Vicodin, and Percocet. (Tr. 78). He also stated that appellee had told him within the last two months that she and Suriano had used cocaine together. (Tr. 79).
 {¶ 51} Appellee's mother, Kathy Irwin, testified about her daughter. She stated appellee has been hospitalized a few times for rehabilitation. (Tr. 101-103). Furthermore, Irwin stated that appellee has been diagnosed as bipolar manic depressant with anxiety. (Tr. 121). Irwin stated that she stayed with appellee for a month and a half in 2004 at the house appellee shared with Suriano. (Tr. 105). She testified that appellee called her and said that she needed help. (Tr. 128). Suriano then went and picked Irwin up and brought her to the house. (Tr. 128). Irwin stated that appellee was taking pills and smoking marijuana then. (Tr. 106-107). Irwin also stated that she never saw Suriano using or selling drugs. (Tr. 108).
 {¶ 52} When asked her opinion about Jaden's custody, Irwin stated that she thought Jaden should live with appellants. (Tr. 113). She opined that at the present time, she did not think appellee was capable of caring for Jaden. (Tr. 113). However, Irwin testified that when she is not high, appellee is a good mother. (Tr. 133).
 {¶ 53} Jolene Gioia, appellee's sister testified next. She testified as to appellee's mental issues and drug problem. She stated that prior to admitting herself into the hospital in 2004, appellee was hallucinating, hearing voices, using drugs, and having a nervous breakdown. (Tr. 138). Gioia also stated that appellee told her that Suriano was supplying her with drugs. (Tr. 140). And she too testified that Jaden has become a bubbly, normal child since she began living with appellants. (Tr. 144). Gioia also testified that Jaden has expressed fear of Suriano. (Tr. 147). And Gioia opined that placement with appellants was in Jaden's best interest. (Tr. *Page 11 
146).
 {¶ 54} The next person to testify was Janet Johnson. Johnson had been Jaden's kindergarten teacher when Jaden was living with appellee and attending Steubenville schools. Johnson testified that Jaden came to school regularly, she wore clean clothes, her hair was neat and clean, she appeared well nourished, and she was very well adjusted in the classroom. (Tr. 163, 172). Johnson further stated that Jaden was kind to the other students and had friends. (Tr. 163). And she stated that Jaden never expressed any concerns or fears to her. (Tr. 165). She testified that Suriano usually brought Jaden to school in the mornings and both Suriano and appellee came to pick her up in the afternoon. (Tr. 170-71). She also testified that Jaden was tardy seven times in a four-month period. (Tr. 169). Johnson stated that when she talked to appellee about Jaden's tardiness appellee explained that Jaden did not want to eat breakfast in the mornings and that appellee wanted to make sure that she ate before coming to school. (Tr. 172). Johnson testified that based on her observations of Jaden, nothing gave her any concerns that Jaden was abused, neglected, or dependent. (Tr. 169).
 {¶ 55} John Rodash, a case worker for JCDJFS, testified regarding his investigation of appellee. He stated that he received a call on December 30, 2004 about Jaden's safety. (Tr. 174). The caller stated that Jaden was staying home from school to take care of her baby brother, that she was exposed to drug activity, and that appellee's house was in poor condition. (Tr. 176). As a result, JCDJFS initiated an investigation. So on January 4, 2005, Rodash and two police officers appeared, unannounced, at appellee's home. (Tr. 181). Appellee and Suriano were home. Rodash testified that he went through the entire house and found all rooms to be appropriate. (Tr. 182). He stated that the house looked "lived in," but that there were no visible hazards for a child. (Tr. 182). He also stated that appellee's baby, D'Angelo, had all of the necessary baby items for his care. (Tr. 182).
 {¶ 56} Rodash also talked with appellee and Suriano. Suriano told him that he helps Jaden with school work and drives her to school. (Tr. 183). Rodash asked *Page 12 
to see D'Angelo, who was visiting at Suriano's mother's house. (Tr. 183). Suriano took Rodash and the officers there. Rodash stated that D'Angelo was healthy and happy to see Suriano. (Tr. 183-84). Appellee did admit, however, that D'Angelo required an extended stay in the hospital after he was born because she had been on a methadone program to break her drug addiction during her pregnancy. (Tr. 184).
 {¶ 57} Additionally, Rodash testified that JCDJFS conducted a child forensic interview with Jaden at its child advocacy center. (Tr. 186). He sat in on the interview to take notes. Rodash stated that Jaden did not give him any concerns about living with appellee. (Tr. 187). The only thing that concerned Rodash was that Jaden said that she felt sad when appellee was "sick" because appellee would swear and fight with Suriano. (Tr. 187). Jaden also told the interviewer that she was not afraid of Suriano, but that he made her clean her room and do her homework. (Tr. 187). After the interview with Jaden, JCDJFS closed the case. (Tr. 199).
 {¶ 58} Officer John Riguad accompanied Rodash to investigate appellee. Riguad testified that the investigation did not support the claim that had been called in to JCDJFS. (Tr. 205).
 {¶ 59} Next, Mary Suriano, Dino Suriano's mother, testified. She stated that she helps appellee care for D'Angelo and that she has helped to care for Jaden in the past. (Tr. 215). She stated that she considers Jaden a granddaughter and would continue to help care for her. (Tr. 215).
 {¶ 60} Finally, appellee testified. She admitted to her history of drug abuse beginning when she was 17. (Tr. 221). She stated that she has been in three different in-patient rehabilitation centers over the years. (Tr. 221). She stated that she would have periods of sobriety and then relapse from time to time. (Tr. 221). When she would spend time in rehab, Jaden would stay either with her mother or appellants. (Tr. 223). Appellee also stated that she has been diagnosed as bipolar manic depressant with anxiety disorder. (Tr. 224). She stated that in 2003 she was placed on a methadone program to wean her from her addiction. (Tr. 225). *Page 13 
Appellants had temporary custody of Jaden during this time. (Tr. 224-25). Appellee stated that at the end of 2004 she was trying to decrease the methadone, relapsed, and began using drugs again. (Tr. 227-28). She stated that this caused her to have a nervous breakdown. (Tr. 228). As a result, appellee called her mother for help. (Tr. 228). She stated that Suriano went and picked up her mother, who then stayed with her for a while. (Tr. 229). Appellee testified that her mother gave her a drug to calm her down, but it made her condition worse. (Tr. 229-30). So in early 2005, appellee admitted herself into another rehabilitation hospital. (Tr. 220). However, she signed herself out a few days later because her insurance would not pay for it. (Tr. 231). Appellee testified that even during the times she had relapsed, she still managed her household by cooking, cleaning, doing laundry, and making sure the children were cared for. (Tr. 231-32). Appellee testified that currently she takes prescribed medications for her mental condition and that she attends counseling. (Tr. 232-33).
 {¶ 61} Appellee also testified regarding Jaden. She stated that when Jaden lived with her in Steubenville, she was involved with Jaden's school life. (Tr. 239). Appellee stated that she baked cookies for Jaden's class, attended parent-teacher conferences, and attended school plays. (Tr. 239). She also stated that Suriano helped Jaden with her homework. (Tr. 239). Appellee also testified that she bathed Jaden, cooked for her, washed her clothes, and combed her hair. (Tr. 240).
 {¶ 62} In addition to the testimony, the magistrate also interviewed Jaden. We have considered Jaden's responses to the magistrate's questions.
 {¶ 63} Based on the evidence, we cannot conclude that the magistrate and the trial court erred in denying appellants' motion for custody of Jaden. The magistrate detailed appellee's drug use and mental health issues. He then noted that this history does not automatically make a parent unsuitable to care for a child under Perales. The magistrate further observed that JCDJFS would not have removed Jaden from appellee's care based on its investigation, that the child forensic interview failed to show any cause for concern, and that appellee has been *Page 14 
able to care for her younger child D'Angelo since his birth.
 {¶ 64} The suitability test requires a detriment to the child be shown before the court takes him/her away from an otherwise suitable parent.Perales, 52 Ohio St.2d at 97. Under the suitability test, "[s]imply because one situation or environment is the `better' situation does not mean the other is detrimental or harmful to the child." Id. Therefore, just because Jaden's home with appellants may be perceived as the "better" placement, this does not mean that appellee is an unsuitable parent. Given the magistrate's reasoning and the supporting evidence, the trial court's order returning Jaden to her mother's custody was proper. Accordingly, appellants' third assignment of error is without merit.
 {¶ 65} Appellants' fourth assignment of error states:
 {¶ 66} "THE TRIAL COURT ERRED BY NOT ORDERING DEFENDANT/APPELLEE TO RELEASE HER MEDICAL RECORDS TO BE REVIEWED BY THE COURT."
 {¶ 67} After the magistrate filed his recommendations, appellants filed a motion for the court to order appellee to provide them with her medical records. The court overruled this motion.
 {¶ 68} Appellants argue that the court erred in not granting their motion. They point out that appellee takes numerous medications for her bipolar manic depressant with anxiety disorder. Appellants contend that the court abused its discretion by keeping out what may have been pertinent evidence of appellee's suitability as a parent.
 {¶ 69} Appellants cite to several cases where the courts stated that whenever custody of children is in dispute, the party seeking custodial authority subjects himself or herself to investigation of all factors, including their mental and physical health. See Sweet v. Sweet, 11th Dist. No. 2004-A-0062, 2005-Ohio-7060; Schill v. Schill, 11th Dist. No. 2002-G-2465, 2004-Ohio-5114; Gill v. Gill, 8th Dist. No. 81463, 2003-Ohio-180. However, these cases all involved divorce custody disputes where the party requesting the medical records did so during discovery before the *Page 15 
magistrate entered any decisions as to the child's custody. Thus, they are distinguishable from the present case.
 {¶ 70} Juv.R. 40(D)(4)(d) provides:
 {¶ 71} "If one or more objections to a magistrate's decision are timely filed, the court shall rule on those objections. In ruling on objections, the court shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law. Before so ruling, the court may hear additional evidence but may refuse to doso unless the objecting party demonstrates that the party could not,with reasonable diligence, have produced that evidence for considerationby the magistrate." (Emphasis added.)
 {¶ 72} Appellants did not file their motion for the release of appellee's medical records until after the magistrate held the hearing and entered his adverse decision. Furthermore, their motion in no way indicated that they could not have made this same request while the case was pending before the magistrate. Appellants filed their complaint on January 3, 2005. The magistrate did not begin the hearing until July 6, 2005. He then continued the hearing until March 23, 2006, where he heard additional evidence. Appellants should have made their discovery motion during this time instead of waiting for the magistrate to issue his decision. They were well aware that appellee's drug history and mental health concerns were to be the major issue at the hearing. And if appellants were not aware of it at the first hearing in July 2005, they were undoubtedly aware of it afterwards and could have filed their motion well before the magistrate continued the hearing in March 2006. Thus, the court was well within its discretion in overruling appellants' motion for the release of appellee's medical records.
 {¶ 73} Accordingly, appellants' fourth assignment of error is without merit. *Page 16 
 {¶ 74} For the reasons stated above, the trial court's judgment is hereby affirmed.
Vukovich, J., concurs.
 Waite, J., concurs. *Page 1